1

2

3

4

5

6

7

8

9            IN THE UNITED STATES DISTRICT COURT

10          FOR THE EASTERN DISTRICT OF CALIFORNIA

11   Gary Harris,

12          Petitioner,                    No. CIV S-02-0028 GEB CMK P

13          vs.

14   A.A. Lamarque,

15          Respondents.              <u>Findings and Recommendations</u>

16   _____/

17          Petitioner is a state prisoner proceeding pro se with an application for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1997 conviction on

19   charges of first degree murder enhanced by the use of a firearm and the sentence of thirty-five

20   years to life.  Petitioner seeks habeas relief on seven grounds: (1) that he was denied his right to

21   represent himself; (2) that the trial court erred by admitting statements which were suppressed at

22   trial based on a <u>Miranda</u>[1] violation; (3) that the trial court abused its discretion in instructing the

23   jury on reasonable doubt; (4) that the trial court erred by failing to re-instruct the jurors at the end

24   of the trial on reasonable doubt; (5) that the trial court erred by refusing to allow defense counsel

25   to impeach a prosecution witness with his prior arrest record; (6) that the prosecutor failed to

26

---

[1]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

1   disclose impeachment evidence on a prosecution witness and; (7) that defense counsel was

2   ineffective for failing to call an expert witness, to challenge the chain of custody on bullets and to

3   object to the timing of the reasonable doubt jury instruction.

4   **Background**

5        In 1997, a jury found petitioner guilty of first-degree murder, enhanced by use of

6   a firearm, and he was sentenced to thirty-five years to life in prison. (Clerk's Transcript ("CT")

7   at 319, Resp't Answer, Ex. D at1.) Petitioner was convicted of murdering Courtney Thompson

8   by shooting him multiple times. (Resp't Answer, Ex. D at 2.)

9        An officer patrolling North Cedar Street in Chico heard shots and observed an

10  African-American male juvenile, who was later identified as Courtney Thompson ("victim"),

11  leave an apartment complex. (Id.) The office called to the victim to stop, but he continued to

12  walk, then fell to the ground. (Id.) The victim later died of multiple gunshot wounds. (Id.) The

13  officer also saw an African-American male adult leave the complex wearing a black cap, dark

14  jacket and pants. (Id.) The jacket had a distinctive white print at the bottom. (Id.) A neighbor

15  who had come outside when he heard the shots saw an African-American man take off a jacket

16  near the parking lot; the neighbor showed an officer the jacket. (Id.) Gunshot residue was later

17  found on the sleeve of the jacket. (Id.)

18       During petitioner's trial, testimony revealed that the victim had gone to "Bonita's

19  apartment[2]" to use the phone. (Id. ) Several witnesses saw petitioner, wearing a dark jacket

20  similar to the one found, walking near Bonita's apartment just before the shots were fired. (Id. )

21  Testimony at trial revealed that petitioner had driven to the apartment complex with Ronnie

22  Osby. (Id. ) Petitioner and Osby stopped at several apartments looking for marijuana. (Id.) Osby

23  testified that, at the third apartment, he noticed that petitioner had a gun. (Id.) Petitioner wiped

24  the clip and put it back in the gun, stating that he was going to "bust some fools." (Id.) Osby

25  

26      [2]Bonita was apparently acquainted with both petitioner and the victim. (Resp.'t Answer, Ex. O at 4.)

1  drove around the block and saw petitioner with a tall man.  (Id. at 3.)  Osby went to the store,

2  and, when he returned, he picked up petitioner who stated that he had shot someone but he did

3  not know if the person was dead.  (Id.)  Osby testified that petitioner had thrown away his jacket

4  and the gun.  (Id.)  Osby agreed to testify against petitioner as part of a plea negotiation.  (Id.)

5  Osby pleaded no contest to being an accessory after the fact.  (Id.)

6          Petitioner testified differently.  (Id.)  He stated that, because Osby wanted a gun,

7  petitioner wiped his prints off his gun and gave it to Osby.  (Id.)  That night, Osby left petitioner

8  at Bonita's apartment, and petitioner did not see Osby again.  (Id.)  Petitioner saw the victim at

9  Bonita's.  Petitioner stated that he ran when he heard gunshots, and he discarded his jacket.  (Id.)

10  The next day, petitioner went to Los Angeles.  (Id.)  Petitioner denied shooting the victim.  (Id.)

11  **Analysis**

12  I.  Standards for a Writ of Habeas Corpus

13          Federal habeas corpus relief is not available for any claim decided on the merits in

14  state court proceedings unless the state court's adjudication of the claim:

15          (1) resulted in a decision that was contrary to, or involved an
          unreasonable application of, clearly established Federal law, as
16          determined by the Supreme Court of the United States; or

17          (2) resulted in a decision that was based on an unreasonable
          determination of the facts in light of the evidence presented in the
18          State court proceeding.

19  28 U.S.C. § 2254(d).

20          Under section 2254(d)(1), a state court decision is "contrary to" clearly established

21  United States Supreme Court precedents if it applies a rule that contradicts the governing law set

22  forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable

23  from a decision of the  Supreme Court and nevertheless arrives at different result. See Early v.

24  Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

25          Under the "unreasonable application" clause of section 2254(d)(1), a federal

26  habeas court may grant the writ if the state court identifies the correct governing legal principle

from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. See Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'") The court looks to the last reasoned state court decision as the basis for the state court judgment. See Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

II. Petitioner's Claims

        A.     Denial of Right to Self-Representation

        Petitioner's first ground for relief is that he was denied his right to represent himself at trial. (Pet. at 8.) Petitioner contends that he was instructed by the trial court to file a written motion to proceed pro-se and that he filed such a motion on August 11, 1997. (Pet.'s Traverse at 4 & Ex. A.).

        A defendant may waive counsel and choose to represent himself. See Faretta v. California, 422 U.S. 806, 835 (1975). However, in order to prevail on his claim that he was denied this right, petitioner must show that his request for self-representation was unequivocal. See Meeks v. Craven, 482 F.2d 465, 467 (9th Cir. 1973.) Whether a demand for counsel is unequivocal is a factual matter subject to the presumption of correctness. See Wells v. Maass, 28 F.3d 1005, 1011 (9th Cir. 1994).

        The underlying record shows that, on August 5, 1997, petitioner disagreed with a request for a continuance of trial by his counsel and asked the trial court if he could waive

1 counsel. (Reporter's Transcript ("RT") at 36-38.) The court advised petitioner to think about his

2 request and granted the requested continuance until September 16, 1997. (RT at 39-40.) The trial

3 court put petitioner's request for self-representation on calendar, suggesting that, if petitioner

4 decided that he wished to proceed without counsel, he write the court a letter. (RT at 39-40.)

5 Petitioner wrote the court a letter, which was received on August 11, 1997. (Pet.'s Traverse, Ex.

6 A.) In his letter, petitioner stated that "his motion was based on [his counsel's] understanding of

7 the law..." and that "[he and his defense counsel] had a conflict of interest." (Id.) Petitioner

8 stated that he had a due process right to a speedy trial and demanded a motion date of August 11,

9 1997, a "TRC" of August 12, 1997 and a jury trial on August 13, 1997. (Id.) Petitioner did not

10 raise the issue of self-representation on September 16, 1997. (RT at 55.)

11      Petitioner has not shown that he unequivocally requested to represent himself. See

12 Meeks, 482 F.2d at 467. Petitioner's letter to the court dealt more with his concern about his due

13 process right to a speedy trial than with his request to represent himself. (Pet.'s Traverse, Ex. A.)

14 Although, petitioner stated in his letter that he "did not want his life in [his defense counsel's]

15 hands," his final sentence demanded a trial date sooner than September 16, 1997. (Id.) Nothing

16 in petitioner's letter may be construed as an unequivocal statement that he wished to represent

17 himself. (Id.) Petitioner did not renew his request to represent himself at the start of his trial on

18 September 16, 1997. The California Supreme Court's denial of this claim was not an

19 unreasonable application of federal law, nor an unreasonable determination of facts presented at

20 the state court proceeding. See 28 U.S.C. § 2254(d). Accordingly, the undersigned recommends

21 that this claim be denied.

22      B.    Miranda Violation

23      Petitioner's next claim is that he suffered a "Miranda violation." He contends that

24 his statements were suppressed, but when he testified, the prosecution was allowed to use his

25 suppressed statements to impeach him.

26

1       The Fifth Amendment right against self-incrimination guarantees that any person

2  taken into custody shall be informed of his important constitutional rights and shall be given the

3  opportunity knowingly and voluntarily to waive those rights before being interrogated.  See

4  Miranda v. Arizona, 384 U.S. 436, 444 (1966).  To prevail on his Fifth Amendment claim,

5  petitioner must show that: (1) his statements were obtained by police in violation of Miranda; (2)

6  the state court committed error in permitting the prosecution to use these improper statements;

7  and (3) the error had a substantial and harmful effect on the jury's determination of its verdict.

8  See Pope v. Zenon, 69 F.3d 1018, 1020 (9th Cir. 1995).

9       The statements used during petitioner's trial to impeach him were statements made

10  by petitioner falsely identifying himself at the onset of his interview with police.  Petitioner

11  contends that he was being held in Los Angeles under a warrant issued for Gary Harris.  (Pet's

12  Traverse at 5.)  Petitioner told police that he did not want to answer questions; in response to

13  continued questioning petitioner stated that he was not Gary Harris but instead was a homeless

14  person.  (Id.)  On the tenth day of petitioner's trial,  the parties and the court met outside the

15  presence of the jury to consider whether statements taken from petitioner during that police

16  interview could be used for impeachment purposes.  (RT at 959.)  The court listened to a

17  recording of the interview.  (RT at 962-64.)  During the interview, petitioner told the police

18  detective that he did not want to talk with him before and after the detective administered the

19  Miranda warning.  (RT at 963-64.)  The detective continued to question petitioner, telling

20  petitioner that his statement would not be used against him in this case.  (RT at 963-64, 966-67.)

21       After listening to the tape and hearing arguments from counsel, the court ruled that

22  petitioner's statements could not be used for any purpose, including impeachment.  (RT at 973.)

23  The only exception to this ruling was that the prosecutor could ask petitioner about the false

24  identification that petitioner provided at the onset of the interview.  (Id.)  The court reasoned that

25  falsely identifying oneself did not fall within the provisions of Miranda and that to not identify

26  yourself may "show a conscientiousness of guilt."  (RT at 974.)

1    The undersigned must first consider whether petitioner's false identification of

2 himself was obtained in violation of <u>Miranda</u>.  In other words, was the false identification the

3 product of a police interrogation or a voluntary statement.  It appears that in response to police

4 questioning after he invoked his right to remain silent, petitioner volunteered that he was not Gary

5 Harris, but was instead a homeless person.  (Pet.'s Traverse at 5.)  Petitioner states that "...the

6 police kept questioning, so petitioner said I'm not the person, I'm homeless and have no driver's

7 license..."  (<u>Id.</u>)  Petitioner's false identification of himself cannot reasonably be said to have been

8 in response to a question that was reasonably likely to elicit an incriminating response.  <u>See</u> <u>U.S.</u>

9 <u>v. Booth</u>, 669 F.2d 1231, 1238 (9th Cir. 1981).  As petitioner's false identification of himself

10 occurred at the onset of his interview, it can reasonably be separated from the improper

11 interrogation that subsequently occurred.  <u>See</u> <u>U.S. v. Poole</u>, 794 U.S. 462, 467 (9th Cir. 1986)

12 (stating that questions asked by FBI agent at close of custodial interview were conducted for

13 investigatory purposes and constituted interrogation.)   Accordingly, the undersigned does not find

14 that petitioner's false identification of himself was obtained in violation of <u>Miranda</u>.

15    The undersigned cannot conclude that the California trial court erred in allowing

16 petitioner's post-<u>Miranda</u> false identification of himself as a homeless man with no driver's

17 license to be used for impeachment purposes.  The trial court excluded all of petitioner's post-

18 <u>Miranda</u> statements except for the statements that he gave the detectives a false name and date of

19 birth.  The trial court gave a limiting instruction stating that these statements by petitioner could

20 show consciousness of guilt, but were not sufficient by themselves to prove guilt.  (CT at 263.)

21 The evidence was admitted to impeach petitioner and was not used to prove petitioner's guilt.  <u>See</u>

22 <u>Henry v. Kernan</u>, 197 F.3d 1021, 1029 (9th Cir. 1999) (stating that trial court erred in admitting

23 post-<u>Miranda</u> statements under guise of impeachment purposes when the evidence obtained in

24 violation of <u>Miranda</u> tends to prove defendant's guilt).

25    Finally, even assuming <u>in arguendo</u> that the trial court erred in admitting

26 petitioner's post-<u>Miranda</u> false identification of himself, the undersigned concludes that the

1   admission of the statements for impeachment purposes was harmless error.  See Pope, 69 F.3d at

2   1025.  In the context of habeas review, the standard is whether the error had substantial and

3   injurious effect or influence on determining the jury's verdict.  See Brecht v. Abrahamson, 507

4   U.S. 619, 637 (1993).  Here, the jury was given a limiting instruction that petitioner's statements

5   were not to be considered proof of guilt.  Also, petitioner's false identification was not the state's

6   primary evidence against him at trial and did not tend to prove the state' s case against him.

7   See Henry, 197 F.3d at 1029 (stating that admission of post-Miranda statements was not harmless

8   error because statements were the crux of the state's case against defendant).

9        The California Supreme Court's denial of this claim was not an unreasonable

10  application of federal law, nor an unreasonable determination of facts presented at the state court

11  proceeding.  See 28 U.S.C. § 2254(d).  Accordingly, the undersigned recommends that this claim

12  be denied.

13        C.    Jury Instruction Error

14        Petitioner's third and fourth claims are that jury instruction errors violated his right

15  to due process.   In the third ground of his petitioner, petitioner contends that the trial court abused

16  its discretion when it failed to instruct on the presumption of innocence-burden of proof standard,

17  the standard of proof and the definition of reasonable doubt at the end of the case after the close of

18  evidence.  (Pet. at 9.)  His fourth ground for relief is that the trial court abused its discretion by

19  failing to reinstruct the jurors on concepts related to reasonable doubt after the close of evidence

20  and the prosecutor's misleading argument.  (Id.)

21        In general, federal habeas corpus relief is not available for jury instruction error

22  unless the error so infects the entire trial that the resulting conviction violates due process,

23  rendering the trial fundamentally unfair.  See  Estelle v. McGuire, 502 U.S. 62, 71-72 (1991);

24  Duckett v. Godinez, 67 F.3d 734, 745-46 (9th Cir. 1995).   A federal court must evaluate jury

25  instructions "'in the context of the overall charge to the jury as a component of the entire trial

26  ///

1  process.'"   Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (per curiam) (quoting Bashor

2  v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)).

3           It is well established that the burden is on the prosecution to prove each and every

4  element of the crime charged beyond a reasonable doubt. See In re Winship, 397 U.S. 358, 364

5  (1970).  Due process is violated by jury instructions which use mandatory presumptions to relieve

6  the prosecution's burden of proof on any element of the crime charged. See Francis v. Franklin,

7  471 U.S. 307, 314 (1985); see also Sandstrom v. Montana, 442 U.S. 510 (1979).  A mandatory

8  presumption is one that instructs the jury that it must infer the presumed fact if certain predicate

9  facts are proved. See Francis, 471 U.S. at 314.  On the other hand, a permissive presumption

10 allows, but does not require, the trier of fact to infer an elemental fact from proof of a basic fact.

11 See  County Court of Ulster County v. Allen, 442 U.S. 140, 157 (1979).  The ultimate test of the

12 constitutionality of a presumption "remains constant:  the device must not undermine the

13 factfinder's responsibility at trial, based on evidence adduced by the State, to find the ultimate

14 facts beyond a reasonable doubt." Ulster County, 442 U.S. at 156 (citing In re Winship, 397 U.S.

15 at 364)).

16          At the beginning of petitioner's trial, but before the first witness was sworn, the

17 trial court gave the jury several instructions.  (RT at 74.)  The judge explained that, although

18 traditionally all the instructions were given at the end of a trial, she felt it was better to give

19 instructions throughout the course of the trial.  (Id.)  The judge gave some instructions at the

20 beginning of the trial, including instructions that the defendant was presumed innocent, that the

21 people had the burden of proving guilt beyond a reasonable doubt and the definition of reasonable

22 doubt.  (RT 87-88.)

23          When the evidence was concluded, the court gave the jury a second set of

24 instructions, which covered primarily the elements of the charged offenses and assessing

25 witnesses' testimony.  (RT at 1062.)  The court reminded the jury that it had given them a set of

26 instructions at the start of the trial and referred to the post-evidence instructions as the "second set

1   of instructions." (<u>Id.</u> at 1063.)  The second set of instructions covered the elements of the charged

2   offenses and assessing the witnesses testimony.  (<u>Id.</u> at 1062-76.)  The court referred to reasonable

3   doubt in selecting the degree of murder and in reference to the personal weapon allegation.  (<u>Id.</u>)

4   The court also instructed that the statements of the attorneys were not the law; the law was

5   contained in the instructions.  (<u>Id.</u> at 1077.)

6         The attorneys gave their closing arguments.  Defense counsel argued at length

7   about reasonable doubt.  (<u>Id.</u> at 1099-1101.)  He referred to the reasonable doubt instruction,

8   identifying it as CALJIC No. 2.90, and invited the jury to read it.  (<u>Id.</u> at 1099.)  Counsel argued

9   that "an abiding conviction means a lasting belief and doubt cannot creep into one's mind." (<u>Id.</u> at

10  1101.)  He stated that before the jury could find petitioner guilty they must "so firmly believe in

11  your decision that you will not second guess that decision at any point in your life." (<u>Id.</u> at 1102.)

12  Defense counsel concluded by stating that the jury had to be "satisfied beyond a reasonable doubt

13  with a lasting conviction that [petitioner committed the crime]." (<u>Id.</u> at 1123.)

14        In rebuttal, the prosecution argued that the defense was "blowing smoke." (<u>Id.</u> at

15  1124.)  The prosecution stated that "[i]t is the relative convincing force of the evidence as

16  presented to you that is required to satisfy you beyond a reasonable doubt that the defendant is

17  guilty and that the burden of proof has been met." (<u>Id.</u> at 1127.)  The court then gave the jury the

18  final jury instructions.  It did not reinstruct on reasonable doubt.  The court reminded the jury that

19  the instructions which it had given would be available in written form for deliberations.  (<u>Id.</u> at

20  1137.)

21        The state court of appeal found that the trial court did fail to reinstruct on

22  reasonable doubt at the end of the trial,  but that the error was harmless beyond a reasonable

23  doubt.  (Resp.'s Ex. D at 5-14.)  The trial court made the following findings:

24              Here, the actual sworn jury was properly and fully instructed on
        reasonable doubt.  The jury was told all the instructions applied regardless of when
25      they were given.  Further, the jury was given the written instructions, which
        contained CALJIC No. 290.  This is simply not a case where the jury was not
26      instructed, or properly instructed, on reasonable doubt.  It is not necessarily a

1    prejudicial error to fail to reinstruct on reasonable doubt at the end of trial.  There
was no denial of due process in failing to reinstruct the jury on reasonable doubt
2    before deliberations.

................................................................

3

4              Although we find that it is an abuse of discretion to fail to instruct
on reasonable doubt after the presentation of evidence in a lengthy trial, we find
5    harmless error in this case.  Significantly, the trial court sent the written in
instructions into the jury during their deliberations.  The court informed the jury at
6    the outset of the trial that it would receive the written instructions.  In instructing
the jury after the close of evidence, the court made reference to earlier instructions
7    as it told the jury to consider the instructions as a whole.

8              The issue of reasonable doubt was argued by the attorneys; it was
the focus of defense argument.  The defense counsel specifically referred to CALJIC No. 2.90 and invited
9    confusion on the issue of burden of proof.  Moreover, the people presented a strong case against
defendant, as shown by the relatively short period of deliberation.  Defendant was present at the
10   shooting; his fingerprint was on the murder weapon; and he fled the scene, discarding his
distinguishing clothing.

11  (Resp. Ex. D at 5-14.) (internal citations omitted).

12            Here, the jury was required to decide whether petitioner was guilty of first degree

13  murder.  Evaluating the jury instructions "in the context on the overall charge to the jury as a

14  component of the entire trial process" it is clear that the jury was fully and properly instructed on

15  reasonable doubt. See Prantil, 843 F.2d at 317 (9th Cir. 1988).  As the state court of appeal found,

16  there was no evidence of jury confusion on the issue of the burden of proof and the verdict was

17  plainly supported by the evidence.  There was no due process violation in the trial court's failure

18   to reinstruct on reasonable doubt at the close of evidence and after the closing arguments.

19  Accordingly, the undersigned recommends that petitioner's third and fourth claims for relief be

20  denied.

21          D.     Failure to Allow Impeachment of Prosecution Witness

22            Petitioner's fifth claim is that the trial court abused its discretion by preventing

23  defense counsel from introducing evidence of a prior arrest record to impeach prosecution witness

24  Salladeen Brown.  (Pet. at 9, citing RT 430-36.)

25            A criminal defendant has a constitutional right to present relevant evidence. See

26  Montana v. Engelhoff, 518 U.S. 37, 41-41 (1996).  However, the accused does not have the right

1  to offer evidence that is "incompetent, privileged or otherwise inadmissable under standard rules

2  of evidence." Id. at 42; see also, Wood v. Alaska, 957 F.2d 1544, 1549 (9th Cir. 1992).

3   Impeachment by evidence of prior conviction of a crime is subject to the limitations of Federal

4  Rule of Evidence 609.  See Fed. R. Evid. 609.  Evidence that a witness has committed a crime is

5  allowed only if the crime was punishable by death or imprisonment over one year, or if the crime

6  of which the witness was convicted involved dishonesty or false statement.  See Fed. R. Evid.

7  609(a)(1) and (2).

8          The record shows that Sallahdeen Brown testified for the prosecution.  (RT at 400.)

9  During cross examination, defense counsel asked Brown if he had given the officer a false name

10  when questioned about this case.  (Id. at 432-33.)  Brown admitted that he had.  (Id.)  Defense

11  counsel asked if that was because Brown was afraid that he would be arrested on violation of a

12  probation warrant;  Brown denied lying about his name due to the probation warrant but admitted

13  that he was in custody on a probation hold from Alameda County.  (Id.)

14          When defense counsel began to ask Brown what he was on probation for, the

15  prosecutor objected, and both counsel approached the bench.  (Id. at 434.)  At the bench

16  conference, the prosecutor told the trial court that Brown did not know what he was on probation

17  for and that the prosecutor had been unable, despite numerous phone calls to Alameda County, to

18  discover what offense was the basis for Brown's probation.  (Id.)  Defense counsel pointed out

19  that he was able to impeach a witness for a crime involving moral turpitude.  (Id. at 435.)  The

20  trial court expressed frustration at the situation, but sustained the objection.  (Id.)  After resuming

21  questioning, defense counsel asked Brown if he expected to be released from custody after

22  testifying.  (Id.)  Brown answered "yes." (Id.)

23          Because it was unknown what offense served as the basis for Brown's probation

24  violation, it was impossible to determine whether his crime was admissible for impeachment

25  purposes under Federal Rule of Evidence 609.  Petitioner has no due process right to present

26  evidence that is inadmissable under the standard rules of evidence.  See Taylor v. Illinois, 484

U.S. 400, 410 (1988).  Petitioner has not shown that his due process rights were violated by the trial court's refusal to allow defense counsel to question Brown about his underlying offense.  The undersigned recommends that this claim for relief be denied.

        E.     Prosecutorial Misconduct

       Petitioner's sixth claim for relief is that the prosecutor committed misconduct by failing to disclose any impeachment evidence concerning prosecution witness, Salladen Brown. (Pet. at 9.)

       Success on a claim of prosecutorial misconduct requires a showing that the conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process.  See Greer v. Miller, 483 U.S. 756, 765 (1987).   A prosecutor has a duty to disclose impeachment evidence.  See United States v. Bagley, 473 U.S. 667, 675-76 (1985).   The suppression of evidence favorable to a defendant violates due process when the evidence is material to guilt.  Brady v. Maryland, 373 U.S. 83, 87 (1963).  Evidence is only material if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different.  See Bagley, 473 U.S. at 681-82.

       Petitioner complains that the prosecutor failed to disclose what crime prosecution witness Brown had committed so that defense counsel could impeach Brown with the conviction. The prosecutor represented to the court and to defense counsel that, although he had tried to obtain information concerning Brown's crime, he was unsuccessful.  (RT at 434.)   Despite being unable to discover Brown's crime, petitioner cannot show that this evidence was material.  He is unable to show that a reasonable probability exists that, had the evidence been disclosed, the outcome of the case would have been different.  For example, although defense counsel was unable to question Brown about the specifics of his crime, counsel was able to present negative information about Brown's credibility.  Defense counsel showed that Brown expected to be released shortly after testifying in petitioner's trial.   In light of the significant shadow cast upon Brown's credibility, it is impossible to show that the outcome would have been different had

1  Brown been impeached by evidence of his underlying offense.  No due process violation occurred,

2  and the undersigned recommends that this claim for relief be denied.

3           F.        Ineffective Assistance of Counsel

4           Petitioner's final claim for relief is that his Sixth Amendment  right to effective

5  assistance of counsel was violated.  (Pet. at 10.)  Petitioner claims that he received a report from

6  an independent expert witness that no prints were found on the gun or magazine and that his

7  attorney was ineffective in failing to call an expert witness to verify this.  Petitioner alleges that

8  his counsel was ineffective for failing to challenge the chain of custody for the bullets from the

9  magazine of the gun which was the murder weapon.  (Id. )  Finally, petitioner claims that his

10 attorney was ineffective by failing to object to the timing of the reasonable doubt instruction or

11 "prosecution burden."  (Id.)

12          The United States Supreme Court set forth the test for demonstrating ineffective

13 assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).  First, a petitioner must

14 show that, considering all the circumstances, counsel's performance fell below an objective

15 standard of reasonableness. See Strickland, 466 U.S. at 688.  To this end, petitioner must identify

16 the acts or omissions that are alleged not to have been the result of reasonable professional

17 judgment. See id. at 690.  The federal court must then determine whether in light of all the

18 circumstances, the identified acts or omissions were outside the wide range of professional

19 competent assistance. See id.  "We strongly presume that counsel's conduct was within the wide

20 range of reasonable assistance, and that he exercised acceptable professional judgment in all

21 significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing

22 Strickland, 466 U.S. at 689).

23          Second, a petitioner must affirmatively prove prejudice. See Strickland, 466 U.S. at

24 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

25 unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

26 reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.;

1   see also Williams v. Taylor, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir.

2   2000).  A reviewing court "need not determine whether counsel's performance was deficient

3   before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . .

4   If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . .

5   that course should be followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting

6   Strickland, 466 U.S. at 697).   In order to demonstrate prejudice in this context, petitioner must

7   demonstrate that, but for counsel's errors, he probably would have prevailed on appeal. See

8   Miller, 882 F.2d at 1434 n.9.

9           Petitioner has failed to establish that any of the alleged errors of his attorney

10  prejudiced him.  As the prosecution's witness testified that no prints were found on the gun, the

11  outcome of the proceeding would not have been different had defense counsel called an expert to

12  testify to the same thing.  (RT at 661.)  Defense counsel cross examined the prosecution's latent

13  print analyst who testified about the prints on the gun's magazine.  (RT at 657-662.)  Under cross

14  examination, the analyst testified that there was no way to tell when the print was left on the

15  magazine; whether it was the night of the murder or two weeks prior.  (Id. at 659.)  Given this

16  testimony, petitioner has not shown that the testimony offered by a defense expert would have

17  changed the outcome of the trial.

18          Similarly, petitioner cannot show that the outcome of his trial would have been

19  different had his attorney challenged the chain of custody of the bullets from gun.  A prosecution

20  witness testified that five bullets were removed from the victim during autopsy.  (RT at 341-346.)

21  Petitioner testified that one bullet, labeled JRL9, was retrieved from the victim's lung during the

22  autopsy and placed into a white envelope.  (RT at 341-42.)  The witness testified that four other

23  bullets, labeled JRL 10-13, were recovered on the second day of the autopsy and placed in an

24  evidence locker.  (RT at 345.)  When questioned as to why a record reflected that the latter four

25  bullets were delivered into the custody of the department of justice in April and the first bullet

26  was listed as being delivered the previous day, the witness stated that he did not know.

Criminalist Dan Dunbar testified that he examined JRL 9 along with the other bullets.  (RT at 375-378.)  Given Dunbar's testimony about the examination of the five bullets at the same time and the well established chain of custody of the other four bullets, petitioner has not shown that a challenge to the chain of custody on bullet JRL 9 would have changed the outcome of the his trial.

Finally, petitioner argues that his counsel's performance was deficient for failure to to object to the timing of the reasonable doubt instruction or "prosecution burden."   As discussed at length in section C, supra, the failure to instruct on reasonable doubt at the end of the trial did not prejudice defendant.  As such, petitioner cannot show that his counsel's objection to the timing of the instruction would have changed the outcome of the proceedings.

Petitioner has not demonstrated that any alleged failure of counsel prejudiced him, and the undersigned recommends that petitioner's claim of ineffective assistance of counsel be denied.

In accordance with the above, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, petitioner may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Petitioner is advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:   July 15, 2005.


_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE